# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* MICKAELS/BALDWIN, Minors.

UNPUBLISHED
September 27, 2016

No. 329364
Kalamazoo Circuit Court
Family Division
LC No. 2011-000352-NA

Before: MURRAY, P.J., and HOEKSTRA and BECKERING, JJ.

PER CURIAM.

Respondent-mother (hereinafter "respondent") appeals as of right the trial court's order terminating her parental rights to the minor children JJ and JL under MCL 712A.19b(3)(b)(*i*) (parent caused the sexual abuse of the child or sibling of the child, and the child will likely suffer from injury or abuse if returned to the parent), (b)(*ii*) (parent had opportunity to prevent sexual abuse but failed to do so, and the child will likely suffer from injury or abuse if returned to the parent), (c)(*i*) (conditions of adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), (g) (failure to provide proper care and custody), (j) (reasonable likelihood that child will be harmed if returned to the parent), and (k)(*ii*) (criminal sexual conduct involving penetration), and terminating her parental rights to JR and JD under MCL 712A.19b(3)(g), (j), and (k)(*ii*).[1]  We affirm.

---

[1] The trial court also terminated the parental rights of the children's fathers, neither of whom is a party to this appeal.

-1-

# I. STATEMENT OF FACTS

The Department of Health and Human Services ("the DHHS")[2] became involved with respondent in late 2010 because, among other reasons, respondent's housing was unsuitable and lacked heat. In November of 2011, a police raid on the house where respondent was living with her husband and their two minor children, JJ and JL, turned up evidence of methamphetamine production in the house. In addition, the DHHS reported that dirty laundry, food, and cockroaches littered the house, and mouse feces were found in the house and in JL's bassinet. Consequently, authorities immediately removed JJ and JL from respondent's care. The children's father pleaded to methamphetamine production and was sentenced to prison.

Respondent complied with the services the DHHS provided and the trial court terminated jurisdiction over JJ and JL in May of 2012, returning them to respondent's care on the condition that respondent continue to live with her mother. However, in August of 2013, the DHHS again petitioned the trial court to remove the children after cigarette burns were discovered on JJ's back. At the time, the only caretakers of the child were respondent and her boyfriend, whom she had met in a homeless shelter, and neither offered any explanation as to how the burns got there. The trial court granted the petition, exercised jurisdiction over JJ and JL, and removed them once again from respondent's care. In March of 2014, respondent gave birth to her two youngest children, JR and JD. Although respondent's incarcerated husband was their legal father, DNA tests revealed respondent's boyfriend to be their biological father.

During a psychological evaluation with Dr. Randall Haugen in April of 2014, JJ revealed that, when he was five years old, respondent's boyfriend forced him to have anal sex with respondent. Following an investigation, respondent's boyfriend pleaded guilty to second-degree criminal sexual conduct and was incarcerated in the Kalamazoo County Jail for 10 months. As part of his plea agreement, the boyfriend testified at respondent's termination hearing, confirming, among other things, JJ's account of the sexual activity.

Further evidence was presented at the termination hearing that, during these proceedings, respondent had lived at a homeless shelter, with her boyfriend and his uncle in a one-bedroom apartment, and with friends, but lacked stable housing sufficient for herself and her children. Respondent lacked employment from August of 2013 onward and provided no evidence that she was looking for a job. Although she was encouraged to apply for Supplemental Security Income (SSI) based on her cognitive limitations, and was offered assistance in filling out the paperwork, she did not follow through.

Witnesses testified that, at the time of the termination hearing, respondent had not seen her two oldest children since May of 2014. She did not complete a program to help her attend to the needs of her oldest child, participate in an assessment of her second child's special needs, or attend medical appointments for her youngest children. She declined to visit the younger

---

[2] Formerly, the Department of Human Services and the Department of Community Health were separate. The Department of Human Services initiated this matter. Because the departments are now one, we will refer to the department as "DHHS."

children more than once a week, despite multiple conversations with a service provider regarding the importance of frequent contact to the development of a parent-child bond.

The trial court heard testimony regarding respondent's long history of depression, stress, and inability to protect herself and her children from the men in her life. During investigation of the sexual abuse of JJ, respondent acknowledged being a victim of domestic violence and rape at the hands of her husband and her boyfriend. She acknowledged plans to divorce her husband, but failed to follow through with them. She also acknowledged that her oldest child had witnessed her having sex on multiple occasions. This conformed to her boyfriend's testimony that he and respondent had had sex two to five times while JJ and JL were in the room, and that while he was helping JJ put his penis in respondent's anus, JL lay next to respondent on the bed. Despite having information as well as first-hand knowledge of her oldest child's exposure to and engagement in sexual behavior, respondent did not protect or seek counseling for the child.

Caseworkers testified that respondent failed to demonstrate sufficient benefit from her participation in counseling services with multiple providers. Likewise, despite her participation in parenting classes, attachment relations with her children were insecure, she lacked empathy for their traumas and a sense of responsibility for her role in their harmful experiences, and her progress during supervised parenting time had been limited.

Based on the record and the evidence presented at the termination hearing, the trial court found that the DHHS had proved the aforementioned statutory grounds for termination by clear and convincing evidence, and that a preponderance of the evidence established that termination of respondent's parental rights was in the best interests of the four children.

## II. ANALYSIS

### A. REASONABLE EFFORTS

On appeal, respondent first contends that the trial court clearly erred in terminating her parental rights because the DHHS failed to make reasonable efforts to reunite her with her children.[3] Generally, reasonable efforts must be made to reunite the parent with the child unless certain aggravating circumstances exist. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010); *In re Frey* 297 Mich App 242, 247; 824 NW2d 569 (2012); MCL 712A.19a(2). "When a child is removed from a parent's custody, the agency charged with the care of the child is [usually] required to report to the trial court the efforts made to rectify the conditions that led to the removal of the child." *In re Plump*, 294 Mich App 270, 272; 817 NW2d 119 (2011). Thereafter, "[a trial] court is not required to terminate parental rights if the State has not provided to the family of the child . . . such services as the State deems necessary for the safe return of the child to the child's home." *In re Rood*, 483 Mich 73, 105; 763 NW2d 587 (2009).

---

[3] Respondent does not take issue with the trial court's findings with respect to the statutory grounds for termination.

Respondent argues that, because of her cognitive limitations, her caseworkers and parenting-time supervisors should have been more explicit in their parenting instructions. Specifically, she contends that caseworkers failed to tell her expressly to pick up the minor children if they needed comfort, to visit the two youngest children more than once a week, or to give serious attention to JJ's fear of her boyfriend. She also contends that CPS worker Matt Dodson failed to inquire properly whether she had sufficient supplies to take care of the two youngest children after their birth. Finally, she contends that, even though her cognitive limitations are such as possibly to qualify her for SSI benefits, and thus for an income source to obtain housing and to provide for her children's basic needs, none of her caseworkers actually sat down with her and helped her complete the necessary application.

Insofar as respondent argues that her alleged cognitive deficits required the DHHS to instruct her explicitly regarding minute details of parenting—such as when to pick up a child or how much regard to pay to their fears—her position finds no support in the law. The DHHS is not required "to provide [the respondent] with full-time, live-in assistance with her children." *In re Terry*, 240 Mich App 14, 27-28; 610 NW2d 563 (2000). Indeed, respondent's "contention that she needed even more assistance from [the DHHS] to properly care for her children merely provides additional support for the family court's decision to terminate her parental rights." *Id.* at 28. For similar reasons, we cannot agree that, because CPS-worker Dodson asked respondent generally what supplies she had for the newborns rather than interrogated her specifically and minutely regarding each of the different items necessary for infants, he "failed to properly investigate" respondent's preparedness to care for JR and JD.

With regard to respondent's argument that she did not receive the assistance she needed to apply for SSI, the record shows that Dr. Robert Griffith—who performed two psychological evaluations of respondent—and foster care worker Colleen Cochrane both offered to help respondent complete her application for SSI benefits, but she declined their offers. "While the DH[H]S has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).

In sum, the DHHS offered respondent parenting classes and other services for several years, yet at the time of termination, evidence shows that respondent's parenting skills were rudimentary and that she had made minimal progress. At no time did she indicate during that the services provided her were insufficient for her needs. After children have come within the jurisdiction of the court, a parent, notwithstanding her cognitive or physical disabilities, "must demonstrate that she can meet [the children's] basic needs before they will be returned to her care. If a parent cannot or will not meet the irreducible minimum parental responsibilities, the needs of the child must prevail over the needs of the parent." See *In re Terry*, 240 Mich App at 28 (quotation marks and citation omitted). Despite several years of services, respondent remains unable to meet her "irreducible minimum parental responsibilities." *Id.* Accordingly, we conclude that the evidence was sufficient to terminate respondent's parental rights, and that the trial court did not err in so doing.

## B. BEST INTERESTS

Respondent next takes issue with the trial court's finding that termination of respondent's parental rights was in the children's best interests. "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). When considering best interests, the focus is on the child rather than the parent. See *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). "The trial court should weigh all the evidence available to determine the child's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). The trial court may consider such factors as "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home[.]" *In re Olive/Metts*, 297 Mich App at 41-42 (citations omitted). Other factors that the trial court can consider include how long the child lived in foster care or with relatives, and the likelihood that "the child could be returned to [the] parent's home within the foreseeable future, if at all." *In re Frey*, 297 Mich App at 248-249. We review a trial court's decision regarding a child's best interests for clear error. *In re Laster*, 303 Mich App 485, 496; 845 NW2d 540 (2013).

Here, it was clear that termination of respondent's parental rights to the minor children was in the children's best interests. The trial court heard testimony that poor parent-child interactions between respondent and her older children showed the weakness of their mutual attachments. Despite having not seen his mother for more than a year, the oldest child had indicated that he did not want to see her, and that he feared spending time with her and her boyfriend. The early intervention specialist observed that respondent's bond with her second child was particularly poor, and that she failed to provide comfort when the child was distressed and she seemed emotionally and physically disengaged from the child. Likewise, her bond with the youngest children was poor, given her reluctance to visit them more than once a week, despite numerous conversations with the early intervention specialist regarding the importance of frequent contact in developing a parent-child bond.

The court heard ample evidence regarding respondent's parenting abilities, particularly her inability to provide a safe environment for her children. Respondent lived with JJ and JL in a home where meth was made, and then with her boyfriend, who sexually abused JJ in JL's presence, and in fact, with her involvement, however passive. Respondent continued to place them in the presence of her boyfriend even after the abuse. Respondent remained unmindful of her role in placing the children at risk of harm and uncomprehending of the trauma the older children suffered while in her care.

Respondent testified at the termination hearing that she lacked housing, she was unemployed, and she lacked the means to support herself. These conditions prevented respondent from providing any of the children with a structured and stable environment. In contrast, the children's caregivers were able to provide for their needs and give them permanency. The record shows that the older children were thriving in the care of their paternal grandmother, who expressed a desire to adopt them. Likewise the younger children were bonded with and thriving in the care of non-relative foster parents, who were meeting the children's medical, physical, and emotional needs, and had indicated a willingness to adopt them.

In sum, the weakness of the parent-child bond between respondent and her children, respondent's inability to keep her children safe and to meet their basic physical, medical, and emotional needs, the unlikelihood that the children could be returned to her in the near future, and the advantages of foster-care placement support the trial court's finding that termination of respondent's parental rights was in the best interests of the children. See *In re Olive/Metts*, 297 Mich App at 41-42; *In re Frey*, 297 Mich App at 248-249.

Respondent argues that the trial court erred in finding that termination was in the children's best interests because the DHHS failed to make reasonable efforts at reunification. However, as discussed above, respondent has not shown that the DHHS failed to make reasonable efforts. For the above reasons, we find that the trial court did not clearly err in finding that termination of respondent's rights was in the four children's best interests. *In re Moss*, 301 Mich App at 80.

Affirmed.

/s/ Christopher M. Murray
/s/ Joel P. Hoekstra
/s/ Jane M. Beckering